Filed 8/28/24  In re I.V. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re I.V. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,   Plaintiff and Respondent, | E083483 |
| | (Super.Ct.No. DPRI2300292) |
| v. | OPINION |
| J.K.,   Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dorothy McLaughlin, Judge.  Affirmed as modified.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie K. Jarvi, Deputy County Counsel for Plaintiff and Respondent.

1

Defendant and appellant J.K. (Mother) appeals from the juvenile court's jurisdictional and dispositional orders adjudicating her three children, G.D. (a boy, born Nov. 2010), A.D. (a girl, born Dec. 2011), and I.V. (a boy, born May 2016; collectively, Minors), dependents of the court pursuant to Welfare and Institutions Code section 300, subdivision (b)[1] and removing Minors from her custody pursuant to section 361, subdivision (c)(1). On appeal, Mother contends there was insufficient evidence presented to support the jurisdictional findings to sustain the section 300 petition and to support the removal from her custody under section 361, subdivision (c)(1).

## FACTUAL AND PROCEDURAL HISTORY

A.     DETENTION[2]

On August 9, 2023, the Riverside County Department of Public Social Services (Department) received an immediate response referral alleging general neglect by Mother for Minors. It was reported Mother and Minors were living on a lawn at a car wash with three dogs. All of their belongings were in trash bags. Minors had last attended in-person school on December 14, 2021, but Mother claimed they were homeschooled. Mother reported they had been staying in a hotel but had lost their benefits.

Prior to responding to the location, a social worker ran a criminal background check for Mother and discovered that she had a pending misdemeanor case for

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The father of G.D. and A.D. was B.D. (Father D.) The father of I.V. was I.V. Sr. (Father V.) They are not parties to the instant appeal.

2

intimidating a business operation.  She had missed an appearance and there was an active bench warrant.  On June 16, 2022, Mother had been convicted of misdemeanor driving under the influence and received a sentence of five years of probation.  On June 1, 2023, her probation was revoked and she was considered a "fugitive."

The family had a prior history with Orange County Child Protective Services (OCCPS).  A social worker with the Department was advised by the OCCPS that all of the information regarding previous encounters with the family was confidential and could not be released without a court order.

On August 10, 2023, the social worker went to the location where Mother and Minors had been staying.  Mother reported she had been hotel hopping but her benefits from CalWORKS had recently been terminated.  Mother had no means of transportation and no family in the area.  Father V. was reportedly in the hospital for a double amputation due to complications from diabetes.  A Riverside County Sheriff's Department deputy was with the social worker and stated that Mother had three active misdemeanor warrants but he did not plan to arrest Mother for the outstanding warrants.

The social worker confirmed that Mother and Minors were living on the lawn in front of the car wash.  There were trash bags that contained their belongings, sleeping bags, and three dogs.  They had some food items and one five-gallon jug of water.  Minors' clothing was dirty but in good condition.  Mother refused to allow the social worker to speak with Minors so the social worker could not fully examine Minors' condition.  Mother reported they had lost some of their belongings when an unknown

3

male gave them a ride and left with their belongings.  She had some items in storage but had no means of transportation to get to the storage unit.

Mother claimed that OCCPS had detained Minors from her in 2019 when she was arrested for driving under the influence.  Minors were placed in foster care where she claimed they were physically and sexually abused.  She had an active case against OCCPS for violating her civil rights.  She claimed to homeschool Minors.  Her home school was called "Squishy's Home School."  She was not connected to any formal home school program and claimed to download books online.  No such home school was found online or registered with the California Department of Education.

Mother did not like to go to shelters with Minors, had no family with whom they could stay, and had no money for a hotel.  She had enough money for a "couple days" of food.  Mother planned to stay on the lawn at the car wash.  Mother submitted to a saliva test; it was negative for all substances.  Mother had family law orders granting her full custody of Minors.  Mother did not know Father D.'s whereabouts.

Mother requested a hotel voucher but the social worker advised her that vouchers could only be obtained through CalWORKS.  The social worker recommended local shelters but Mother refused to take Minors to a shelter.  She also refused to voluntarily place Minors in a home.  Mother refused all services.

Based on Mother's refusal to accept services and the inability to provide housing for Minors, the Department detained Minors from Mother, Father D., and Father V. under a protective custody warrant.  Once Minors were with the social worker, she noted that

4

they were all visibly dirty and had a foul odor. After the first night of sleeping in a bed and being given food, Minors appeared very happy.

G.D. reported that he believed he should be in seventh grade. He did not know about being enrolled in homeschool. G.D. had some tooth pain. He advised the social worker that one time he and his siblings had been removed from Mother and were placed in a place called Orangewood. He reported that Minors were "yelled at a lot," while in the facility. G.D. reported that "bad things" happened to I.V. at Orangewood; I.V. was assaulted by a staff member. G.D. reported also that he was beaten up by another child at Orangewood.

A.D. reported she was supposed to be in sixth grade. Mother made money by cooking for people on the streets and making arts and crafts. Mother owned horses, which were being kept at her friend's ranch. A.D. suffered from anxiety when she was not with her dogs. Minors and Mother used to live at a home with Father V. but there was a man that blew kisses at A.D. so they moved out. A.D. reported that they oftentimes stayed in hotels.

I.V. reported he thought he was supposed to be in first grade. I.V. showed the social worker the blisters he had on his feet from walking long distances in bad shoes. He also had two teeth that were painful and made it difficult to eat. He did not recall ever seeing a dentist. I.V. indicated there were times they did not have enough food. I.V. stated that while at Orangewood, a staff member had touched his private areas without his permission. He did not want to talk about the incident. He reported that G.D. was stabbed in the face with a pencil at Orangewood.

After the detention of Minors, Mother sent a letter to the Department with numerous grievances including that Minors were kidnapped by the Department and subjected to human trafficking.  Father V. reported he had given Mother over $4,000 in the prior two months for hotels but had run out of money.  He was considering seeking custody of I.V.  Mother had refused to enroll Minors in school even though encouraged to do so by Father V.

The Department was concerned due to Mother's housing instability and unwillingness to obtain services to protect Minors.  Further, Minors were not enrolled in school.  Mother refused a referral to a dentist claiming she did not like the chemicals that were used.  Mother had no relatives who could take custody of Minors.

On August 11, 2023, the Department filed section 300 petitions (petitions) for Minors as to Mother, Father D., and Father V.  It was alleged under failure to protect against Mother under section 300, subdivision (b), that (b-1) Mother lived a transient lifestyle and was unable to safely care for Minors by living in numerous hotels and outside without seeking services; (b-2) she neglected the health and safety of Minors as they appeared disheveled, dirty, had a foul odor, and blisters on their feet; (b-3) she put Minors at risk of suffering serious physical and emotional harm by failing to meet their educational needs by keeping them out of school; and (b-4) she neglected their needs by failing to take them to the dentist and they were suffering from tooth pain.

The detention hearing was conducted on August 14, 2023.  The trial court found a prima facie showing had been made that Minors came within section 300, subdivision

6

(b). Continuance outside the custody of Mother was necessary to protect the well-being of Minors. Father V. was named the presumed father of I.V.

## B.    JURISDICTION/DISPOSITION REPORT

On September 1, 2023, the Department filed a jurisdiction report. It recommended that the juvenile court find the allegations against Mother and both fathers true. The Department sought a continuance of the disposition hearing in order for Mother to participate in two psychological evaluations. Minors had been placed together in a foster home.

OCCPS had reported that Minors had been taken from Mother's custody on August 4, 2019, when Mother was arrested for driving under the influence. They were in out-of-home placement at Orangewood from August 4, 2019, until September 19, 2019. They were returned to Mother on a Family Maintenance plan. Mother claimed that I.V. reported he was inappropriately touched by persons at the facility. G.D. reported that he was beaten up. There were further investigations of Mother after this incident. This included reports to the Department that Minors were not attending school, Minors were seen outside the home they were living in at the time—unsupervised—despite it being a "gang neighborhood," and Minors were left home by themselves on many occasions while Mother went out drinking.

The Department recommended that the juvenile court find all of the allegations in the petitions true. Through interviews with Minors, they had been homeless for over one year. When Minors were detained, they were dirty, disheveled, and wore ill-fitting shoes that were causing blisters. Minors were not enrolled in school and there was no evidence

7

supporting Mother's claim that they were homeschooled. I.V. could not read and A.D. could not tell time and had trouble writing. G.D. had missed sixth grade and needed a tutor for math and spelling. A.D. had missed most of fifth grade. I.V. had not attended school for two years. Mother had failed to provide any further documentation of school enrollment. Mother had failed to obtain dental treatment for Minors and they were suffering from dental problems. A.D. had four cavities and needed glasses. I.V. had two cavities and stated that it hurt to eat. He had never been to a dentist. G.D. had not seen a doctor in four years. I.V. had been to a doctor only once when he fell and needed stitches.

Social workers attempted to interview Mother but she just made statements that the Department had wrongfully detained Minors and that she was going to sue the Department. Mother, during visitation, had to be redirected several times as to what she was telling Minors but she insisted she could say anything she wanted to her children. The Department was concerned that Mother may be suffering from an untreated mental health problem, which was impacting her ability to care for Minors. The jurisdiction/disposition hearing was set contested.

An addendum to the jurisdiction report was filed on September 25, 2023. The Department continued to recommend that the allegations in the petitions be found true and the disposition continued for Mother to complete psychological evaluations. Further attempts were made to interview Mother, but she refused to speak with the social worker unless she could record the conversation. Mother complained at a visit with the children that they were not being properly cared for in the foster home. Mother claimed Minors

were being held hostage against their will. Minors were seen by a dentist. I.V. and G.D. had cavities and would need follow-up care. A.D. was seen by a doctor and was being screened for possible anemia. She also needed glasses. It was further noted that Minors had never been vaccinated.

Mother objected to A.D. having her blood drawn. Mother encouraged G.D. to disclose where he was living despite the foster family wanting their address to be confidential. Mother also was concerned that I.V. had been examined by a doctor who checked his "private area." She threatened to sue the caregiver who took him to the doctor. She advised the social worker that she did not consent to Minors receiving medical treatment. Father V. was visiting with I.V. and visits were going well.

An additional addendum report was filed on October 18, 2023. During the reporting period, Mother contacted a social worker and requested the foster mother's phone number, which was confidential. Mother was upset and sent messages to the social worker complaining about the Department keeping Minors.

A.D. reported enjoying living with the foster mother because she had a bed to sleep in. She liked going to school. A.D. wanted to call Mother so she could check on her dogs and horses. G.D. also liked the foster home. He liked making friends at school but was not doing well academically. I.V. did not want to live with Father V. but liked visits with him. He liked the foster home since he had food to eat and a bed to sleep in. He liked school and was doing well. Minors expressed that they would like to live with Mother. A.D. was found to be low on iron and was taking iron pills. Minors had follow-up dental appointments and were scheduled to see a therapist.

Mother told Minors not to talk to the social worker and that they did not have to do therapy. Mother told A.D. not to take any pills that were prescribed for her because they were poison. Mother also made a comment that she may have to pick them up from their school. G.D. expressed to her that he wanted to stay in school. I.V. also advised Mother that he did not want to leave the foster home because he loved going to school. At another visit, Mother brought groceries to Minors claiming that they had advised her there was not enough food at the foster home. Minors denied that they did not have enough food.

Mother was offered services but she declined. She wanted Minors returned to her and accused the Department of abducting them. Mother claimed that she owned the "land patent" for the car wash where they were initially found sleeping on the lawn. Mother refused to be interviewed by the Department. Mother did not appear to have any insight as to how her actions affected Minors. At a hearing on October 23, 2023, the matter was continued. The juvenile court ordered that the Department assist Mother with housing.

Another addendum report was filed on November 9, 2023. Mother refused parenting classes and counseling. She said that all she needed was her therapy horses. The Department visited Minors at their school. A.D. had new glasses and stated she could see very well. She liked her foster home. She had plenty of food and clothes. She liked school and was doing well. She enjoyed therapy as it helped her with her anxiety. G.D. liked school and his friends. He liked his caregivers. His grades were improving. He wanted the Department to help Mother with housing. G.D. did not like therapy as he

10

did not like discussing his feelings. I.V. felt safe in the foster home. He liked visits with Father V. and Mother. He also liked his therapy. He wanted to live with Mother or Father V. but did not want to be separated from G.D. and A.D.

The social worker contacted Mother about a program where she could obtain housing vouchers. Mother complained that this was not what the juvenile court had ordered. Mother wanted money. Mother later sent a message that she was homeless because she never received compensation from the OCCPS. She threatened to sue the Department. Mother finally agreed to take a bus pass and be referred for housing vouchers. Mother had a visit with Minors. Mother had to be redirected several times not to talk about the case. Mother cancelled two visits with Minors indicating she had to do something for her horses. Mother told Minors during the next visit that she could not get a job because the Department was blocking her from getting a job. She told them that she had not received any money for housing and was living in a trailer.

The Department filed amended petitions for Minors on November 15, 2023. The Department added an allegation in b-8 that Mother appeared to have unresolved mental health issues for which she was not receiving treatment.

On November 15, 2023, a hearing was held. The Department requested that the juvenile court find the allegations in the first amended petitions true. The Department requested that disposition be bifurcated and that the juvenile court order that Mother be subject to psychological examinations in order to determine whether they could bypass services pursuant to section 361.5, subdivision (b)(2). Mother's counsel stated that Mother was upset because she had been notified that she had to remove her horses from

11

their current location. Mother was too upset to testify and was seeking a continuance. Mother also wanted help from the Department to house her horses. Mother's counsel insisted the horses were emotional support horses for Minors. I.V. was especially bonded to the horses. Mother also still needed housing. The Department was ready to proceed. The juvenile court was willing to grant a short continuance.

The juvenile court ordered the Department to assist Mother in finding housing, help her with relocation of the horses, and have Minors visit with the horses. The jurisdiction hearing was continued. At the same hearing, the juvenile court ordered that I.V. receive his vaccinations. Mother filed an appeal from the order authorizing vaccination of I.V.[3]

On November 28, 2023, another addendum report was filed by the Department. At a visit with Mother on November 10, 2023, Minors expressed that they all loved school. Mother brought lunch for Minors and brought one of their dogs. Mother talked to Minors about their friends. They played on the playground and went for a walk. Mother had called the Department to set up a visit between the horses and Minors on November 16, 2023. When the social worker went to the location, Mother was with the horses and dog near a home. The horses were being kept in a dirt area near a road. Mother claimed the person kicked her out of the home, but she still wanted to meet with Minors on the side of the road. The social worker indicated that it was not safe for

---

[3] The appeal in case No. E082611 was dismissed.

12

Minors to visit. Animal control officers arrived and advised Mother she could not keep the horses on the street. Mother would not disclose where she was living.

A woman contacted the Department and advised a social worker that Mother was living in a trailer by her house. The woman reported that she believed that Mother may be suffering from some mental health issues. The foster mother reported she was afraid that Mother was trying to brainwash Minors that the foster home was not meeting their needs. Mother had not made herself available for several visits and Department meetings. Mother signed paperwork to obtain housing but refused to answer many questions claiming she was protected by the "privacy Protection Act."

C.    CONTESTED JURISDICTIONAL HEARING

The contested jurisdictional hearing was held on November 28, 2023. J. Jones (Jones) was a social worker employed by the Department. She was aware that homelessness alone was not a reason to detain a child from his or her parents. Jones first met Mother and Minors on the lawn of the car wash on August 9, 2023. Jones did not initially see signs of neglect of Minors but Mother refused to allow Minors to speak with her. Jones did not immediately detain Minors. She sought to have her supervisor assist her, and obtain a warrant to detain Minors. She returned later that night. Prior to detaining Minors, Jones did not offer a hotel voucher to Mother but offered to take her to a shelter called Safehouse where they could stay but Mother refused. The Department did not have hotel vouchers to offer Mother. Jones detained Minors based on Mother not providing another solution for the safety of Minors. Mother was going to keep the children outside until she was sent money by Father V. for a hotel. Jones attempted to

13

get help for Mother through CalWORKS but no one was available to help. Mother seemed erratic when Jones talked to her.

Once Jones had Minors in her custody, she saw how dirty they were and that they had a foul odor. She was able to see blisters on the bottoms of their feet. Jones detained Minors due to Mother's erratic behavior, their not being enrolled in school, and their medical and dental needs were being neglected.

M. Reyes (Reyes) was also a social worker employed by the Department. Mother had refused to go over the allegations in the first amended petitions with Reyes. Reyes tried to get Mother therapy but she refused. She would not answer all the questions in order to obtain housing. Reyes admitted that Minors wanted to be returned to Mother's care. I.V. complained about pain in his mouth but Mother had not taken him to the dentist. Minors loved school and A.D. was benefitting from therapy. Minors were happy in the foster home.

V. Salazar (Salazar) was a supervisor at the Department. A housing referral had been submitted for Mother in the prior week and she was offered information on various shelters. Mother refused to speak with any of the social workers. Mother had no known mental health diagnosis. The Department did not have hotel vouchers and had to work through community providers. Reyes had interactions with persons suffering from untreated mental health issues and Mother's actions were similar to these persons.

Mother testified. Minors had been in her custody for the majority of their lives. She had insurance for Minors through Medi-Cal. In December 2022 Mother and Minors were evicted from their apartment in Anaheim. She insisted that the eviction was

14

retaliation from the landlord. The landlord sent cockroach specialists to the apartment and they actually dumped live roaches in the kitchen. She was denied housing assistance by Anaheim Housing Authority.

Mother moved to Riverside in February 2023. She moved from hotel to hotel. She was getting benefits from CalWORKS but they ended. The hearing was continued.

The matter was called again on December 13, 2023. Mother resumed her testimony. When Jones came to the car wash, Mother explained that her CalWORKS had been discontinued. Jones never offered to help with her benefits. She had concerns about shelters and she wanted to know more about the shelters. Reyes did not offer to help her with CalWORKS. Mother was only given a list of shelters. Mother wanted Minors returned to her. They were happy being homeschooled. She never took Minors to the doctor because they never got sick.

Mother's counsel argued that the case was "troublesome." It was clear that the Department targeted Mother because of her homelessness. Minors were bonded to Mother and they missed Mother while in their placements. Jones did not try to work with Mother and set up a safety plan; she detained Minors. The Department never helped Mother with CalWORKS. Mother's counsel requested that all allegations be dismissed as they were based solely on her homelessness status. There was no evidence of her suffering from any mental health issues.

The Department contended that Minors were detained based on Mother refusing to go to shelters offered to her and Minors. The Department understood her concern about

shelters but law enforcement already indicated that she could not stay outdoors with Minors. The juvenile court took the matter under submission.

On December 15, 2023, the juvenile court made its ruling. The trial court found the allegations b-2, b-3, b-4, b-5, b-6, b-8, and g-2 in the first amended petitions were true by a preponderance of the evidence for Mother, Father V., and Father D.; the b-1 allegation of homelessness was found not true. The juvenile court ordered that Mother submit to two psychological evaluations before the disposition was decided. Mother's counsel objected to the evaluations. The juvenile court noted that it was a close issue on the b-8 allegation but the trial court noted that Mother did not always make sense. The juvenile court believed the psychological evaluations may help Mother.

D. DISPOSITION PROCEEDINGS

Mother filed a request for a protective order and return of Minors, and a civil rights violation claim. She insisted that social workers at the Department made false allegations against her. She filed an attorney misconduct claim against her counsel. On January 8, 2024, she filed a family court services complaint form. She filed the complaint against her counsel and wanted the juvenile court judge to recuse herself. Mother filed a complaint for damages against the Department, and some of the social workers involved in her case but the document was unintelligible. The juvenile court rejected these filings.

The Department filed an addendum report on January 23, 2024. The Department recommended that Mother and Father V. be granted reunification services. Minors would remain in their foster care placement. On December 19, 2023, Mother contacted the

16

Department claiming they had kidnapped Minors and she was working with the police to have them returned to her care. Mother refused to provide an address where she was living even though the Department needed it in order to refer her for housing. The social worker inquired of Mother on December 21, 2023, whether she was going to submit to the court-ordered psychological evaluations. Mother claimed that the court order was "appealed and objected." She claimed the Department's employees needed a psychological evaluation. Mother refused to answer any questions about her childhood or adulthood. She denied that she or Minors needed any services. Minors should be returned to her care and they would be homeschooled. Mother refused to attend a visit with Minors at one of the Department's offices insisting visits were ordered to take place with the horses and dogs. Mother called the police accusing one of the social workers of kidnapping Minors.

Mother and Minors had a visit on January 3, 2024. Minors expressed they wanted to live with Mother but understood they needed a safe residence. Minors were willing to participate in therapy and they loved school. The visit included one of the dogs but not the horses. Mother advised Minors that she was staying at someone's property where she was responsible for feeding the animals on the property. Mother again refused on January 10, 2024, to disclose her address to the Department; any documents should be sent to her attorney. The Department could not assist her in obtaining housing unless she disclosed the information.

Mother got upset when Minors advised her that they had COVID tests. Mother got upset with the social worker. She insisted that Minors rights had been violated.

Mother encouraged Minors to call the police if their caregiver did something they did not like. Mother told Minors that they would be returning to her care the following week when she got money from CalWORKS. Mother then started talking about her court cases, including a case against the OCCPS. She had to be directed not to talk about the cases in front of Minors.

The doctor who was appointed to conduct the psychological assessment on Mother, Dr. Garrett, contacted her. She questioned his credentials and did not submit to an examination. Dr. Garrett stated to the social worker that based on his prior experience and the people he had treated, Mother was suffering from a delusional disorder. He also stated Minors suffered from her behavior and it was a good thing they were removed from her care.

The Department noted to the juvenile court that Mother had failed to provide the proper information in order to get her housing and had not completed the psychological examinations. It was not clear whether she could complete her services but they were recommending that she receive services. Mother filed an additional lawsuit against the Department and the social workers. It was also unintelligible. She also filed a section 388 petition. She accused the Department of kidnapping Minors and she wanted them returned to her custody. She discussed that the social workers were submitting false information to the juvenile court. The juvenile court was aware that she had owned land patents and that Minors should be immediately returned to her care.

The disposition hearing was continued and the Department filed an additional addendum report on February 15, 2024. The Department received a call from

18

Community Access Network reporting that Mother declined to participate in case plan services. They were closing a referral submitted for therapy services. Mother met with the social worker and provided school supplies for Minors and clothes for A.D. Mother continued to accuse the Department of kidnapping Minors. The Department noted that Mother had made no progress in completing her psychological examinations.

Mother's counsel filed a request that the juvenile court grant reunification services. Mother was attempting to comply with the psychological evaluations. Moreover, Mother objected to the statements by Dr. Garrett that she had a delusional disorder. They only spoke on the phone for five minutes.

The disposition hearing was held on February 21, 2024. Mother contested the disposition recommendations. T. Davis (Davis) was called by Mother. She was a social worker from the Department and worked on Mother's case. She acknowledged that Minors wanted to live with Mother. Mother had been consistent in her visitation with Minors. Davis did not recommend return to Mother's care on family maintenance based on her failure to participate in any services. The Department also needed to perform a home evaluation to make sure that it was safe and adequate for Minors but Mother refused to disclose her address. The Department wanted Mother to submit to the psychological evaluations.

Mother testified that she wanted Minors placed with her. Minors had been in her care for their entire lives. Mother insisted she had a job and could provide for Minors. She had purchased two trailers to put on property that she owned but did not disclose the address. She insisted that the Department had failed to provide her housing.

19

Mother's counsel argued Minors should be placed with Mother under a family maintenance plan. Poverty was not a reason to deny family maintenance. It was critical that the Department find Mother housing. The Department remained concerned that Mother had failed to participate in any services. Further, she refused to provide an address so that her home could be evaluated. The Department was concerned about the safety of Minors. Mother had failed to provide any information to the Department regarding her present ability to care for Minors. The Department was requesting family reunification services.

The juvenile court adopted the Department's recommendations. I.V. was placed in the custody of Father V. on family maintenance. Mother was granted reunification services. The juvenile court also authorized liberalized visitation, including overnight and weekend visits, for Mother with Minors. It also ordered that the Department could place Minors in Mother's care on a family maintenance plan if the Department was able to find housing for Mother. Mother was to submit to psychological evaluations as previously ordered. Dr. Garrett was to be excluded as an evaluator.

Mother filed an appeal on March 11, 2024. She appealed the jurisdictional findings on October 23, 2023, and the disposition findings.

## DISCUSSION

Mother contends the juvenile court erred in assuming jurisdiction over Minors because there was not substantial evidence that Minors were at risk of suffering serious physical harm or illness as a result of her conduct. Mother insists that claims that Minors had a foul odor, wore ill-fitting shoes, and needed to go to the dentist were all attributable

20

to her indigence and not legal grounds for jurisdiction. She additionally claims that school absences did not warrant juvenile court intervention. Moreover, the fact that she was suing the Department and accused the social workers of kidnapping Minors were not signs that she suffered from a mental illness to support jurisdiction. Mother additionally claims that the disposition orders must also be reversed.

A.     JURISDICTION

"Generally, to acquire jurisdiction under subdivision (b) of section 300, the juvenile court was obliged to find that the child 'has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result' of specified forms of parental neglect, including substance abuse, domestic violence, and failure to protect the child." (*In re L.O.* (2021) 67 Cal.App.5th 227, 237 (*L.O.*).) "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.)

Effective January 1, 2023, Senate Bill No. 1085 (2022–2023 Reg. Sess.) amended subdivision (b) of section 300 to add a provision related to indigency. (Stats. 2022, ch. 832, § 1; see § 300, subd. (b)(2)(C).) Section 300, subdivision (b)(2) provides, in relevant part, that a "child shall not be found to be a person described by this subdivision solely due to . . . [¶] (A) Homelessness or the lack of an emergency shelter for the family. [¶] . . . [¶] (C) Indigence or other conditions of financial difficulty, including, but not limited to, poverty, the inability to provide or obtain clothing, home or property repair, or childcare." (§ 300, subd. (b)(2); see also *In re M.D.* (2023) 93 Cal.App.5th 836, 849 (*M.D.*)

21

The burden of proof at the jurisdictional hearing is a preponderance of the evidence. (*In re I.C.* (2018) 4 Cal.5th 869, 876.) " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Initially, the Department concedes that Mother's failure to enroll Minors in school was not a proper basis for jurisdiction. In *In re Janet T.* (2001) 93 Cal.App.4th 377, the Department alleged children were at risk because the mother failed to ensure school attendance and mother had mental and emotional problems. (*Id.* at p. 382.) The court in *Janet T.* found the failure to ensure school attendance insufficient to sustain a dependency petition because although "the lack of education may well cause psychic or emotional or financial or social harm," it did not create a substantial risk of suffering serious physical harm. (*Id.* at pp. 388-389.) We agree with the Department that the b-3 allegation did not warrant jurisdiction. However, "[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is

22

supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence."  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

Mother complains that the b-2 and b-4 allegations, that Mother failed to seek medical treatment for Minors by not taking them to the dentist and she neglected their health and safety by them being disheveled, having a foul odor, being dirty, and having blisters on their feet from ill-fitting shoes, were all based on her indigency and could not support jurisdiction.

"[P]overty alone, even abject poverty resulting in homelessness, is not a valid basis for assertion of juvenile court jurisdiction."  (*In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1212.)  The appellate court in *M.D.*, *supra*, 95 Cal.App.5th 836, analyzed section 300, subdivision (b)(2)(C).  It found, " 'indigence may be a factor considered under section 300, subdivision (b), so long as [it is not] the only factor.' "  (*Id.* at p. 849.)

Here, the court did not exercise jurisdiction over Minors because of poverty or homelessness.  The juvenile court found the b-1 allegation of homelessness did not support jurisdiction.  The court found the existence of jurisdiction because Mother exposed Minors to substantial risks of physical illness and injury by neglecting Minors' health putting them at substantial risk of suffering serious harm.

Mother refused any type of services offered by the social worker who responded to the location where Minors and Mother were living on a lawn at the car wash.  The social worker was concerned based on Minors having a foul order and being dirty. Mother refused to go to a shelter where Minors could shower and take care of their

23

personal hygiene.  She only reported she did not like shelters.  She complained that I.V. had been molested in a foster care facility, but she provided no information about experiencing problems in shelters.  I.V. had blisters on his feet from walking long distances in ill-fitting shoes.  I.V. also reported to the social worker that there were times that he did not have enough food.  Mother was clearly neglecting the needs of Minors and refused to take any action to provide them with the appropriate facilities to care for themselves.  Mother had no intention of taking care of Minors' needs as she refused any assistance from the Department and refused to seek medical attention for Minors.  This included only taking I.V. to the doctor one time in his lifetime.  Further, it was later discovered that A.D. suffered from anemia, which posed a risk to her health, and Mother told her not to take the iron pills because they were "poison."  Substantial evidence supported the b-2 allegation in the petitions.

The evidence also supported the b-4 allegation.  Once a social worker was able to speak with Minors, they advised the social worker that their teeth hurt, and I.V. had trouble eating.  When Minors were taken to the dentist, I.V. had four cavities and required dental work.  G.D. also had cavities and tooth pain.  Mother never advised the Department that she was unable to take Minors to the dentist based on her indigency, but in fact, she refused to take them claiming she did not like the chemicals.  She also testified that she had Medi-Cal insurance for Minors, which showed she could take Minors to the doctor and dentist, but refused to take them.  Substantial evidence supported the b-4 allegation.

Minors were in need of medical and dental attention and their personal hygiene had been neglected by Mother when they were detained by the Department. Mother refused any services that would enable her to address the medical issues. She was offered resources for housing, emergency shelter housing, and free dental and medical exams. Mother refused all of these services, putting Minors at risk of substantial harm. This risk was not due to Mother's indigency but rather her refusal to accept services for Minors. (See *M.D.*, *supra*, 93 Cal.App.5th at pp. 853-854 [father's rejection of services offered to him supported the conclusion that he lacked "insight into the serious concerns that led to dependency"].) The sole reason for the removal of Minors was not indigency but the neglect by Mother of the care of Minors. The juvenile court properly determined that a preponderance of the evidence showed Minors were at a substantial risk of suffering serious physical harm or illness, as a result of Mother's neglect. (*L.O.*, *supra*, 67 Cal.App.5th at p. 237.)

Mother further insists that there was no evidence supporting the allegation of mental illness. She did not suffer from a mental illness and complains that Dr. Garret only spoke with her for five minutes over the phone, which could not support his claim that she was suffering from a delusional disorder.

The b-8 allegation stated as follows: "The mother suffers from unresolved mental health issues, has not provided documentation indicating she is under a doctor's care or is taking psychotropic medication. Further, the mother continues to make concerning statements regarding government entities, cites case law regarding topics that have nothing to do with the safety of her children and refuses to participate in the interview

25

process without video-taping every interaction with DPSS, such behaviors are effecting her ability to properly provide appropriate care for the children."

The juvenile court noted that it was finding the allegation true based on its own observations in court. It noted that Mother did not always make sense; a psychological evaluation would be helpful to Mother. Further, the social workers expressed difficulty communicating with Mother. Mother was continuously quoting Penal Codes to the social workers that did not make sense. She compared medical appointments, such as physicals, to the rape of children. The social worker stated Mother's behavior was similar to other persons she had encountered who suffered from unresolved mental illness. Mother claimed to own "land patents" where she and Minors were found living. She accused the Department multiple times of kidnapping Minors.

While Mother may have been suffering from a mental illness, there was no substantial evidence that it posed a substantial risk that Minors would suffer, serious physical harm or illness as a result of her behavior. While Mother appeared to not focus on reunifying with Minors, but rather was more focused on filing suit against the Department and social workers, there was no substantial evidence of harm to Minors based on this conduct. Nonetheless, the petitions were supported by the b-2 and b-4 allegations and we affirm the juvenile court's finding of jurisdiction. (*In re Alexis E.*, *supra*, 171 Cal.App.4th at p. 451.)

Finally, Mother claims the Department made no effort to assist her and Minors and simply removed Minors. Mother focuses on the Department's refusal to give her hotel vouchers. She also claims the social worker could have bought shoes for Minors and

26

taken them to shower. The Department did offer these services to Mother and she refused. She was offered several options for shelters where the children could take care of their personal hygiene and receive other services but she refused. The Department could not issue hotel vouchers and tried to contact CalWORKS to help Mother but they were not immediately available.[4]

B.      DISPOSITION

Mother insists the juvenile court erred by removing Minors from her care as the high standard of proof for removal of clear and convincing evidence was not met.

"After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must determine the appropriate disposition for that child. [Citation.] The court has broad discretion in selecting a disposition that serves the child's best interests." (*M.D.*, *supra*, 93 Cal.App.5th at p. 856.) "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . . [¶] There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . custody." (§ 361, subd. (c)(1).)

---

[4] Mother also complains that the Department could not take jurisdiction just to have her participate in services without a finding of risk of serious harm. As we have found that the allegations in b-2 and b-4 were supported by the evidence, we need not address the issue.

" 'In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention.' [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' " (*M.D., supra,* 93 Cal.App.5th at pp. 856-857.)

"We review a juvenile court's dispositional order removing a child from parental custody for substantial evidence, ' "bearing in mind the heightened burden of proof." ' [Citation.] 'Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt.' [Citation.] Still, the appellant bears the burden of showing ' "there is no evidence of a sufficiently substantial nature" ' to support the dispositional removal order." (*L.O.*, *supra*, 67 Cal.App.5th at p. 245.) We must "indulge all legitimate inferences to uphold the court's order." (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212.)

Here, by the time of the disposition hearing, Minors were attending school regularly and thriving in the foster home. The Department tried to find housing for Mother so that she could have Minors returned to her care, but she refused to fill out the paperwork necessary for her to be provided housing. Mother claims on appeal that she filled out the necessary portions of the paperwork. The Department reported and the social worker testified that Mother had failed to complete the necessary paperwork to obtain housing. Mother had no means of taking care of Minors' needs at the time of the disposition hearing based on her own actions.

Mother also would not disclose to the social workers her current address so a home evaluation could be completed. She had not completed her psychological examinations despite being ordered by the juvenile court. There were no reasonable means by which the Department could protect the well-being of Minors short of removal from Mother's custody. I.V. went to live with Father V. G.D. and A.D. remained in the foster home where they had been placed since the beginning of the dependency proceedings. The Department made every effort to work with Mother, but she was not interested in services or completing the necessary documents to ensure housing. A home evaluation could not be completed due to her failure to cooperate with the Department.

Moreover, it was evident Mother would not obtain medical care for Minors if returned to her care. Mother told A.D. not to take her iron pills for anemia because they were "poison." She threatened to sue the Department for having COVID tests performed on Minors. She also threatened to sue the Department for having taken Minors to the doctor.

Without an address for the Department to ensure the well-being of Minors, and Mother's resistance to medical care for Minors, there was clear and convincing evidence there was a substantial danger of harm if they were returned to her custody. The juvenile court at the disposition hearing ordered that if Mother were to cooperate, the Department was authorized to liberalize visitation and even place Minors in her care under a family maintenance plan. It was up to Mother to cooperate to obtain housing and the return of Minors.

Substantial evidence supported the removal of Minors from Mother to protect Minors. We uphold the jurisdictional and dispositional orders.

**DISPOSITION**

We strike the b-3 and b-8 allegations in the petitions. As modified, the juvenile court's jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

RAPHAEL
J.